The facts of the case sufficiently appear from the opinion of the Court.
In 1838 the plaintiff Rhea and the defendants Vannoy and Garland, and McKay, whose heirs are defendants, entered into a *Page 195 
written agreement, under seal, in regard to certain tracts of land, bid off at the land sales, in Cherokee County, among others, lots Nos. 4 and 5, in District 7 (the subject of this controversy). According to this agreement, the parties were to own the land as copartners; pay for it equally, and share equally in all profits arising from mining operations or agricultural pursuits or other use or disposition of the land. "Such disposition to be made of the property as a majority might deem advisable." One-eighth of the price was paid in cash, and the balance secured by note and sureties, as required by the statute. Lot No. 4 was purchased at $879.75, and there was paid thereon, including the one-eighth paid in cash, $513.11. The excess over one-eighth was paid by Vannoy, except $50, which was paid by the plaintiff, but Vannoy alleges he let him have this money. Lot No. 5 was purchased at the price of $270.56, and there was paid thereon $76.37. The excess of this sum over the one-eighth was paid by Vannoy.
The bonds to secure the purchase money were executed by (284) McKay and Vannoy, with one Piercy and Carson as sureties. Rhea was an obligor in the small note for lot No. 5, and the certificate of purchase was given in the name of David McKay Co. McKay became insolvent and left the county, and afterwards, in 1845, Vannoy sold the land to the defendant Daws and executed a deed therefor, and received from him $500 in money, and an obligation to assume the payment of the balance due, or the bonds given for the purchase money, and relieve the principals and the sureties from the payment thereof, and have his name substituted as principal on the bonds, which was accordingly done by the consent of the agent of the State, and the note then stood in the list of notes where the principals are solvent. After the passage of the act of 1850, which provides for a revaluation, Daws was recognized by the commissioners appointed under that act as the purchaser of the land and the person entitled to take out the grant upon the payment of the balance of the purchase money, and they gave him a certificate to that effect. Upon the revaluation the price to be given for the land was reduced about $400, so as to leave only about $60 to be paid upon the bonds in which Daws was the principal, he having before made a payment of $100. The plaintiff, after the act of 1850 was passed, bought the claim of Garland, and having, as he alleges, previously bought the claim of McKay, so far as regards the mineral interests, filed this bill to enjoin the defendant Daws from taking out the grant in his own name, and praying that he may be declared by a decree of this Court to be entitled to one-half of the land, i. e., one-fourth as an original copartner and one-fourth as the assignee of Garland, and to one-fourth of the mineral interests in the whole as the assignee of McKay, and that partition be made accordingly; and in the *Page 196 
alternative, if he is not entitled to the relief prayed for against Daws, that Vannoy may be required to account for the amount received of Daws in the sale of the land, also for the large sums which he had (285) previously received by way of tolls and rents and profits made by him both in mining operations and agricultural pursuits.
The defendant Garland, who is described in the bill as a citizen of the State of California, and the defendants, the heirs of McKay, who are described as citizens of Blount County, Tennessee, do not answer, and the bill is taken pro confesso as to them.
Vannoy in his answer avers, that besides his own he also paid McKay's part of the cash installment of one-eighth; that he let the plaintiff have the $50 which he paid on the bonds, and that he made all the other payments that were made on the bonds; that a small part of the amount so paid by him was the proceeds of the tolls, rents and profits that he had made from the lands, which he applied towards the extinguishment of the bonds, but he was under no obligation to use the land for mining or farming purposes, unless he chose to do so; that the plaintiff worked at different times and different places on the land just as he chose, but failed to make any payments on the bonds, although he supposes, judging from the result of his own operations, that the profits were small; that he paid out his own money, and property, which was sold under executions issuing on the judgments taken on the bonds, a sum exceeding $500; that McKay, soon after the purchase, became insolvent and ran away and went to parts unknown, and abandoned all further connection with the business; that Garland resided in the county of Yancey, and finding the land not valuable for mining purposes, and not being a party on the bonds, gave himself no further concern about it; that Rhea was insolvent, and left the county, and was absent when the time came for suits to be brought on the bonds, and gave himself no further concern about it until after the passage of the act of 1850, under which proceedings were taken by the defendant, Daws, and the valuation was reduced nearly one-half; and he avers that neither McKay or Garland or Rhea offered to assist him in any way, either by furnishing credit or funds, and thus he was deserted and left alone and (286) unsupported to do the best he could in the premises; that after he had been sold out, and became insolvent, the sureties urged him to relieve them by disposing of the land, as it was impossible for him to pay for it; this could only be done by a surrender under the act of 1844, or by selling to some solvent person who would agree to take the trade off of their hands and assume the payment of the bonds, or rather the judgments which had been taken upon them; accordingly, he transferred the lands to the defendant, Daws, who became the principal in the bonds, and thereby relieved both the former principals and the *Page 197 
sureties, and paid him $500, which he avers will not reimburse him for the money he has paid and the costs and other losses he has been subjected to, after making full allowance for the tolls, rents, and profits he has been able to realize.
The defendant Daws avers he purchased the land and took a conveyance from Vannoy, who was in possession and had the entire management and was insolvent, and unable to complete the purchase or relieve his sureties except by making some disposition of the land, that he paid him $500 in cash, and assumed to pay the balance due on the bonds given to secure the purchase money. This he avers was a full consideration. He also avers that he purchased without notice of any equity on the part of the plaintiff. He also avers that under the deed of bargain and sale executed to him by Vannoy, he took possession in 1845, and has held a continued adverse possession for more than seven years before the bill was filed.
The manner in which the lands in the county of Cherokee were sold, the privileges given to purchasers, the many acts that have been passed for their relief, the facility given to the transfer of these land claims, and the surprising extent to which they have been made the subject of traffic and speculation, present an anomalous condition of things, to which it will be very difficult to apply the ordinary rules (287) either of law or equity.
Are the purchasers or their assignees, before a grant has issued, to be considered for any purpose as claiming the legal estate? Is there no law in Cherokee, and must all controversies in regard to these land claims be carried into the court of equity? Can a purchaser for valuable consideration without notice protect himself in no case, on the ground that he is not clothed with the legal title? If the legal estate is in the State for all purposes, and the transaction be treated as a mere contract of sale, then by the ordinary rules of equity the vendor is a necessary party, for otherwise he will not be bound, and the decree will not end the litigation. How can the State be made a party so as to be bound to make title according to the decree? Can the officers of the State be made parties? Will no length of adverse possession under color of title quiet a man in the enjoyment of his estate, on the ground that the title is in the State, and nullum tempus occurrit Regi? These are questions suggested by an examination of this case, but which we are not now called on to decide, and we prefer to follow a prudent rule, and feel the way as we go.
We are satisfied from the bill, answer and proofs, and many concurring circumstances, that the averments of Vannoy are true. The land turned out to be only valuable for farming purposes. McKay became insolvent, left the country, and abandoned all interest under the *Page 198 
agreement. Garland, who was not liable as obligor, also abandoned it, and Rhea, if not insolvent, certainly was not in a condition to be able to raise the amount necessary to discharge the balance due on the bonds, if he had been willing to do so; and it could not be forced out of him by legal process. So he also abandoned all interest under the agreement and went to Georgia, where he thought the prospects of finding gold were more flattering. This conduct on their part superseded the (288) stipulation by which a concurrence of a majority was required in regard to the disposition of the land, or rather it amounted to an implied concurrence or consent that Vannoy, who was left as the only acting and managing partner, might make any disposition of the land that was necessary and proper in the emergency, in order to relieve the members of the firm and their sureties from the embarrassment in which they were placed. Good faith and fair dealing support this inference and all they could in equity require of Vannoy was to dispose of the land, bona fide, so as to make the most of it, and to account to them for whatever he was able to save out of the wreck. We are satisfied he acted with bona fides, and made an advantageous disposition of the property, considering the circumstances. Upon this broad ground of substantial justice we think the plaintiff has failed to establish any equity against the defendant Daws and cannot, after Daws has relieved "the firm" from a burden that it was not able to bear, come into a court of equity and ask to deprive him of the benefit of a statute passed five years afterwards, upon any technical right growing out of the agreement of copartnership, which they had long before abandoned. InRhea v. Tathem, post, 290, decided at this term, where the facts are the same, it is held that Vannoy had the right, under the act of 1844, to surrender the land. If he had done so in this instance, the plaintiff would have had no right whatever; consequently, it can be no ground of complaint that, instead of doing so, he disposed of the land to the best advantage, so as to give the plaintiff a right to call for an account and to share in whatever has been saved.
To prevent the inference that we think any other relief, except an account against Vannoy, could be given under this bill had the plaintiff made out his case, it is proper to notice the prayer, i. e., that the defendant be enjoined from taking out a grant, and be decreed to account for profits, and in the event he should obtain a grant, that he be declared a trustee and that partition be made, and for general relief.
The prayer for an injunction against obtaining a grant, except (289) as secondary and in aid of some other relief, is without precedent.
The plaintiff must be entitled to relief at the time the bill is filed, and cannot ask for relief upon the happening of a future event; consequently, the admission that neither of the parties had the legal *Page 199 
estate puts the prayer for partition out of the question. Partition is made of the "corpus." The parties must have the legal estate in order to make it; an interest under a contract of purchase cannot be divided into parts.
The prayer that the Court will make a declaration of its opinion as to how the parties are respectively entitled under the contract of purchase, and the prayer for general relief, can answer no purpose; for the court will not make a declaration of its opinion as to which of two parties is entitled to an equity, unless it can take some action and enforce the right by its decree. Tayloe v. Bond, 45 N.C. 5. This Court has no right to give its opinion as to which of two persons the sovereign ought to issue its grant. How the plaintiff could get a case constituted in Court so as, according to the course of the Court, to be able to follow the land before the title was passed out of the State, is one of the difficulties growing out of the supposition that the legal title is, to all purposes, still in the State, alluded to above.
Bill dismissed as to Daws with costs, and decree for an account between plaintiff and Vannoy, to include the $500, and such tolls, rents, and profits as were received by either of the parties up to the time of sale to Daws, and the payments made by each.
PER CURIAM. Decree accordingly.
(290)